**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: August 13, 2010**

_____
**JOHN C. AKARD
UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-61289 |
| | § | |
| BPRE, LP, | § | CHAPTER 11 |
|     Debtor. | § | |
| | § | |
| BPRE, LP, | § | |
|     Plaintiff, | § | ADVERSARY NO. 09-06032 |
| | § | |
| vs. | § | |
| | § | |
| RML WAXAHACHIE DODGE, LLC, | § | |
| RML-MCLARTY-LANDERS | § | |
| AUTOMOTIVE HOLDINGS, LLC, | § | |
| RML WAXAHACHIE FORD, LLC, | § | |
| RML WAXAHACHIE GMC, LLC, and | § | |
| RLJ-MCLARTY-LANDERS | § | |
| AUTOMOTIVE GROUP, | § | |
|     Defendants. | § | |

**MEMORANDUM OF OPINION**

    This adversary proceeding involves a dispute over the leasing of property owned by BPRE, LP ("BPRE") located in Waxahachie, Texas and initially occupied by BP Automotive LP ("Automotive") which did business as Bossier Dodge and as Bossier Chrysler Dodge.

## BACKGROUND

The BPRE filed for relief under Chapter 11 of the Bankruptcy Code on November 2, 2009 in the captioned case. A related entity, Bossier Country LP, filed a Chapter 11 case on November 5, 2009. Bossier Country LP ("Bossier Country") operated a Chrysler and Dodge dealership in Fairfield, Texas.

This Adversary Proceeding was filed on November 25, 2009 by BPRE and by Automotive. On February 2, 2010, Chief Bankruptcy Judge Ronald B. King signed an Order Dropping BP Automotive, LP as Misjoined Party and Dismissing all Claims of BP Automotive, LP, without Prejudice. (Docket #27.)

**Judge King's Orders.** On July 15, 2010, Judge King issued three orders which have a bearing on the trial of this matter:

- Order on Partial Summary Judgment for RML Waxahachie Doge, LLC. (Docket #135.)

    o As to count one of BPRE's complaint, Judge King granted partial summary judgment and stated: "As BPRE, LP was not a party to the Asset Purchase Agreement, Plaintiff may only proceed with claims for alleged breaches of the document entitled 'Exhibit 1.4 (iv) LEASE Between BPRE, LP Lessor, AND RML Waxahachie Dodge, LLC Lessee,' which Plaintiff refers to as the 'March Lease' under COUNT ONE."

    o "Trial shall proceed as to the remaining material issues in dispute related to **COUNTS TWO, THREE, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE and TEN** as to this Defendant." (emphasis in original).

- Partial Summary Judgment for RLJ-McLarty-Landers Automotive Holdings, LLC. (Docket #136.)

    o Summary judgment was granted for Defendant, RLJ-McLarty-Landers Automotive Holdings, LLC, on counts one and five.

    o Trial was allowed to proceed against RLJ-McLarty-Landers Automotive Holdings, LLC on counts two, three, four, six, seven, eight, nine and ten.

- Findings of Fact Pursuant to Defendants' Motions for Partial Summary Judgment (docket #130) (the "SJ Facts"). Judge King made 29 findings of fact which "shall be binding in the trial of these adversary proceedings [sic]."

The trial of this adversary proceeding was conducted on July 19, 2010. In addition to the testimony at trial, the parties asked the court to consider the depositions which were offered as exhibits.

**Complaints.** A brief summary of the counts in Plaintiff BPRE's Adversary Complaint would be helpful:

- Count One: Breach of Contract – Asset Purchase Agreement. Per Judge King's order (docket #135), this count is applicable only to the extent that a form of lease was attached to the Asset Purchase Agreement. Judge King also granted summary judgment in favor of RLM-McLarty-Landers Automotive Holdings LLC on this count. (Docket #136.)

- Count Two: Tortious Interference with Franchise Agreements.

- Count Three: Tortious Interference with Prospective Business Relations.

- Count Four: Civil Conspiracy

- County Five: Unfair Competition by Misappropriation. Judge King granted summary judgment in favor of RLD-McLarty-Landers Automotive Holdings, LLC on this count. (Docket #136.)

- Count Six: Breach of Contract – Lease  This count alleges that there is a binding lease with RML Waxahachie Dodge and that the lease was breached when that company took possession of the property and failed to pay rent.

- Count Seven: Quantum Meruit for taking possession of the property and not paying rent.

- Count Eight: Trespass to Real Property for taking possession of the property and not paying rent.

- Count Nine: Unjust Enrichment for taking possession of the property and not paying rent.

- Attorneys' Fees are requested under Texas Civil Practice and Remedies Code ¶¶38.001, *et. seq.* BPRE also requests exemplary damages.

## FACTS[1]

The Plaintiff, BPRE, is owned by Larry Scott Bossier and Randy Pretzer. BPRE is a real estate partnership which owned the land and buildings in Waxahachie, Texas where Automotive conducted its business and the land and buildings in Fairfield, Texas where Bossier Country conducted its business. Larry Scott Bossier and Randy Pretzer also owned Automotive and Bossier Country, both of which were Chrysler and Dodge dealerships. Both parcels of real estate were covered by one lien totaling approximately $5.7 million, payable at $40,500 per month.

Automotive was not doing well financially, so in 2008, the partners decided to sell the dealership conducted by Automotive. Mr. Pretzer, on behalf of Automotive and BPRE, talked to several prospective purchasers. RLJ-McLarty–Landers Automotive Holdings LLC (the "RLJ Group") had acquired dealerships for other brands located physically on either side of Automotive, so it was a likely purchaser. Mr. Pretzer testified that he decided to sell to the RLJ Group because it promised to close the transaction quickly. In an e-mail dated February 27,

---

[1] As much as possible, the court will limit the findings of fact to those which relate to the real estate involved in this Adversary Proceeding and will not discuss other transactions between the parties.

3

2009, Paul Hart (a representative of the RLJ Group) told Mr. Pretzer that: "This should be a very quick close." (BPRE's exhibit 63.)

**Letter of Intent.** On March 6, 2009, Mr. Pretzer as "Manager" of Bossier Chrysler Dodge and Steve Landers, President, on behalf of the RLJ Group entered into a letter of intent for the RLJ Group to purchase the assets and business of Automotive. (BPRE's exhibit 132.) The following language appears at the top of page two of the letter of intent:

> A triple net lease agreement will be entered into between the Purchaser and Sellers with the principal terms as follows: (1) The real property will include the facility and the five developed acres, (2) the adjacent five undeveloped acres are included in the real property initially although the Purchaser recognizes that the Sellers have these five acres listed for sale, (3) the monthly lease amount will be fixed at $26,000 per month throughout the term of the lease, including renewal periods, (4) the total time period that the lease agreement will cover is ten (10) years with the initial term of the lease covering one year with three renewal periods of three years each based on 90 days written notice of Purchaser to renew, and (5) the Purchaser shall have right of first refusal on both land parcels.

**Asset Purchase Agreement.** On March 20, 2009, RML Waxahachie Dodge, LLC ("RML WD") [by Steve Landers] and Bossier Chrysler Dodge [by Randy Pretzer, Managing Member] and Randy Pretzer as "Stockholder," entered into an Asset Purchase Agreement (the "APA"). (BPRE's exhibit 176.) In the agreement, RML WD was referred to as the Purchaser; Bossier Chrysler Dodge was referred to as the Company[2], and Mr. Pretzer was referred to as the Stockholder. Provisions of the APA which are significant to the current inquiry are:

- Section 1.3(e) provides, in part, "The Closing Date shall be on or before April 15, 2009, or as soon thereafter as practical (the "Closing Date")."

- Section 10.1 provides that: "Time is of the essence with respect to this agreement."

- Section 1.4(v) provides that closing will occur when all conditions to the obligations of each party have been satisfied or waived.

- Section 5.6(i) states that the parties will use their best efforts "to obtain prior to the earlier of the date required (if so required) or the Closing Date, all waivers, permits, licenses, approvals, authorizations, qualifications, orders and consents of all third parties and governmental authorities, and to make all filings and registrations with governmental authorities which are required on their respective parts for (A) the consummation of the transactions contemplated by this Agreement, (B) the ownership and operating after the Closing of the Purchased Assets by the Purchaser, and (C) the conduct after the Closing by the Purchaser of the business now being conducted with the Purchased Assets by the Company."

---

[2] As noted, Bossier Chrysler Dodge was a d/b/a for Automotive.

4

- Article 6 provides: "The obligations of Purchaser required to be performed by them at the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, each of which may be waived by Purchaser as provided herein except as otherwise required by applicable law." Section 6.7 requires that: "Purchaser shall have obtained within the Inspection Period the consent, authorization and approval of manufacturers on terms acceptable to Purchaser."

- Section 1.4 further states: "At the Closing referred to in Section 1.4(v) hereof: . . .

  (iv) W. Randy Pretzer and the Purchaser shall enter into a lease for the land and improvements used in the business of the Company substantially in the form attached hereto as Exhibit 1.4(iv) (the "Lease"); . . .

  The lease is not attached to the copy of the APA which is BPRE's exhibit 176.

- Section 3.2 states: "Stockholder owns 100% of the entity that owns the Real Property described in the Lease in fee simple, free and clear of all liens, claims and encumbrances, except as set forth is Schedule 3.2."

  The evidence revealed that BPRE, the owner of the real estate, was owned by Mr. Pretzer and Mr. Bossier.

  There was no schedule 3.2 attached to the APA which BPRE's exhibit 176. As noted below, there was a substantial lien on the real property.

- Section 5.4(a) states: "From and after the date of this Agreement and until the Closing Date, the Company shall, and the Stockholder shall cause the Company to, conduct its business solely in the ordinary course consistent with past practices and, without the prior written consent of the Purchaser, neither the Stockholder nor the Company will, except as required or permitted pursuant to the terms hereof, permit the Company to make any material change in the conduct of its business and operation or enter into any transaction other than in the ordinary course of business consistent with past practices.

**March Lease.** A lease between BPRE, LP as Lessor and RML WD, as Lessee, is BPRE's exhibit 174. The cover page of this lease contains the notation "EXHIBIT 1.4(iv)." The signature for the Lessor is L. Scott Bossier, II, Mgr. BPRE, LP. Steve Landers signed for RML WD.

- The date of the lease is blank. Mr. Bossier testified that it was March 20, 2010; the same as the APA.

- Paragraph l.1(a) of the lease states that the "Demised Premises" includes:

  That certain real property located in the County of <u>Ellis</u>, State of Texas, commonly known as and described in Exhibit A attached hereto and made a part hereof, together with any buildings and improvements now or hereafter located therein or thereon (collectively the "Real Property")

5

Exhibit A to the lease, entitled "Demised Premises" is blank.

- Paragraph 2.1 states that the term of the lease "shall commence on the date hereof."

- Schedule A states that the fixed rent is $26,000 per month, including the initial term and renewal periods.

Bossier and Pretzer warranted that they owned "100% of the entity that owns the Real Property" described in the form attached as Exhibit 1.4(iv), which was substantially the form of lease Mr. Pretzer agreed to enter into with RML WD <u>upon closing the APA</u>. (SJ Facts #22) (emphasis added).

Evidence of the ability to secure a lease when applying for a franchise with Chrysler was sufficient for a dealer application to Chrysler Motors, LLC. (SJ Facts #16.) Evidence of a franchise from Chrysler Motors, LLC was required for RLM WD to make a license application to the State of Texas Motor Vehicle Division. (SJ Facts #8.) A signed lease for the Waxahachie property was a document required for the Texas license application package. (SJ Facts #19.)

Mr. Bossier expected RML WD to commence paying rent once the March 20, 2009 lease was signed, but RML WD did not pay any rent until March 1, 2010 (almost a year after the March 2009 lease). Apparently all of the negotiations on behalf of BPRE were done by Mr. Pretzer and there is no evidence that Mr. Bossier's expectations concerning the commencement of rent payments were conveyed to RML WD. BPRE did not bill RML WD for the rent or make any other demands for rent during the months of March, April, May, June and July 2009. As noted below, a new lease was signed in July 2009.

**Gary Anstice #1.** On March 24, 2009, Gary Anstice, the Group Controller for several of the RLJ Group's Texas dealerships sent an e-mail to Mr. Pretzer stating: "Could I get Sharon to make me copies of the following: Motor Vehicle License, OCCC License, Insurance License, Copies of property tax statements (for legal description). We will need these to operate under while we are applying for our own licenses. I am attaching a form for you to look at which will need to be signed at the time of takeover to allow us to operate under your licenses. The OCCC will tell you that there is a 90 day delay in looking at the application – that's why we are asking for 180 days – probably overkill but I'm still fighting to [get] our licenses for the Texas Group." Mr. Pretzer responded that he "will send them today." (BPRE's exhibit 71.) He sent the forms, but there is no evidence that Mr. Pretzer signed the form to allow RML WD to operate under Automotive's licenses.

**Lisa Pickram.** Lisa Pickram, an officer and director of the RLJ Group, expressed concerns about the APA in an e-mail dated March 25, 2009 when she stated: "I thought we had agreed that we were not going to pursue this at this time." (BPRE's exhibit 153.) In an April 9, 2009 e-mail to Paul Hart, Chief Financial Officer of the RLJ Group, about the Waxahachie transaction, Ms. Pickram said: "Clarified with Bob that this is approved. Please let us know how much the wire is and when we should send." On April 30, 2009, Mr. Hart replied to that e-mail stating: "We have not closed the Waxahachie dealership until we had a better understanding of Chrysler's position this week. We will likely close Monday or Tuesday of next week and will

6

likely need the $350,000 capital on Monday. I will confirm with you on Friday." (BPRE's exhibit 158.)

RML WD was required to seek Chrysler's approval as part of the APA. (SJ Facts #9.) On April 17, 2009, BPRE was informed that Chrysler Financial had not signed off and Paul Hart did not know why. (SJ Facts #10.)

**Chrysler Bankruptcy.** On April 30, 2009, Chrysler Motors, LLC filed a voluntary Chapter 11 Bankruptcy in the New York Bankruptcy Court. (SJ Facts #11.) Several witnesses testified that there was a great deal of discussion about Chrysler's financial solvency in the financial press during April 2009.

**Dealership Closed.** Automotive closed its dealership May 1, 2009. (SJ Facts #17.)[3] In mid-May, 2009 Chrysler Motors, LLC sent out notice of its rejection of Franchise Agreements with over 700 Dealerships and Automotives' franchise was one of those rejected. (SJ Facts #12.) Automotive did not challenge the rejection of its franchise agreements with Chrysler Motors, LLC, or seek arbitration. (SJ Facts #13.)

**New Chrysler.** On June 10, 2009, following approval by the Bankruptcy court, the automotive operations of Chrysler Motors LLC were sold to Chrysler Group LLC (the "New Chrysler").

**July Lease.** On May 15, 2009, Mr. Pretzer e-mailed Mr. Hart stating:

"What we'd like to see is two agreements:

"Rent agreement: 5 year increments—renewable with 90 [days] written notice, first right of refusal to include the 5 acres + improvements + use of the additional 5 acres. Triple net (NNN) with one month's deposit up front.

"Asset purchase agreement"

(followed by details of the asset purchase) (BPRE's exhibit 196.)

On May 28, 2009, Mr. Pretzer e-mailed Mr. Hart where, among other things, he stated: "The lease as proposed is not acceptable. Initial term must be 2 years + 5 + 5 (we need the 2 years – critical to our mortgage holder). There should be some adjustment after 7 years – you can build a building or continue to lease ours – pretty flexible. The building is clean and near rent ready. We must add one month's deposit (last) to the agreement. Generally the balance is acceptable." (BPRE's exhibit 197.)

On June 1, 2009, Mr. Pretzer e-mailed Mr. Hart that he "had talked to Steve tonight" and they had agreed on the lease with a first period of 18 months and the right to cancel during the first 18 months if Chrysler discontinued manufacturing. (Defendants' exhibit 18) Presumably "Steve" is Steve Landers with whom Mr. Pretzer negotiated these various transactions.

---

[3] No testimony was offered to explain why the dealership was closed.

7

On June 17, 2009, Mr. Hart e-mailed Mr. Pretzer in which he stated: "attached is the lease agreement which has just two changes from before (eighteen month term and an addition at 17.6(d) for the Chrysler manufacturing termination). I am waiting on a bill of sale from our attorney on the equipment/parts purchase. We are targeting a July 1 start date with Chrysler, assuming that we can temporarily work off your license which I believe that Gary and you have discussed. The only outstanding item is GMAC finalizing the floor plan which I have been told is being reviewed in Detroit. Based on this target date, we would likely come to Dallas late next week to meet with you regarding equipment and parts." (BPRE's exhibit 198.) Attached to that e-mail was a press announcement that Chrysler was going to restart production at seven plants in the United States.

On July 2, 2009, Teresa McDaniel, Dealer Placement Manager in the Southwest Business Center of Chrysler, e-mailed Mr. Hart, "My understanding is that the only other issue outstanding is with the State of Texas. Chrysler Group, LLC still does not have a license to do business in Texas. Our Market Rep people are working with the state to obtain licensing." Mr. Hart forwarded that e-mail to Mr. Pretzer with the following comment: "I am expecting the floor plan from GMAC any day but have not received final sign-off from them. However, since Chrysler has changed its entity, they evidently have a technical change with their licensee with Texas that they are still finalizing. I presume that this is a priority issue with the Texas Vehicle Commission but am not sure how to predict whether this would be a few days or a week or two. We are committed to getting this done with you and share your frustration for the delay. We are ready to go forward and do not need a month-end cut-off to start." (Defendants' exhibit 25)

On July 14, 2009, Mr. Hart e-mailed Mr. Pretzer: "Attached is the lease document with a new section added in Article 2.3 that notes the lease will commence after approval has been received by TMVC. We have the evidence of franchise from Chrysler and just need this lease document executed to send in our application to motor vehicle commission. Gary plans to take the application this week and believes we will have the license within 30 days. If you are fine with this addition, please sign and we will send you the executed document. (BPRE's exhibit 200.)

On July 20, 2009, BPRE and RML WD entered into another lease. (Defendant's exhibit 55) It is signed by Mr. Pretzer on behalf of BPRE and by Steve Landers, President of RML WD. The term as stated in Article 2 is 18 months with three renewals of three years each. The lease provides:

> 2.3 <u>Commencement Date</u>. The lease shall commence three business days after the Lessor (sic) receives the necessary consents and authorizations from both Chrysler Group LLC and the Texas Motor Vehicle Commission to conduct business on the demised premises as a Chrysler franchised automotive dealer.

Schedule A listed the rent at $26,000 per month. Exhibit A is supposed to contain a description of the demised premises but it is blank.

The following provision appears on page 14 of the lease:

8

> 20.5 <u>Incorporation of Prior Agreements; Amendments.</u> This Lease contains the entire agreement and understanding of the parties hereto with respect to the subject matter hereof. All prior agreements or understandings pertaining to the subject mater hereof shall be of no force or effect. This Lease may only be amended or modified in writing signed by the parties in interest at the time of such amendment or modification.

Mr. Pretzer said he entered into the July 20, 2009 lease in the hope that RML WD would start paying rent. Representatives of RML WD told him they hoped to receive the necessary approvals within 30 days. The approvals were not received within that time.

**Gary Anstice #2.** Mr. Anstice testified that on May 7, 2009, he renewed the state dealer's license for Automotive. (BPRE's exhibit 95.) He received a key to the Waxahachie building sometime in May, 2009. Starting in the middle of July 2009, he used a portion of the building for 5 weeks to repair used vehicles for the adjacent dealerships owned by the RLJ Group, to install a computer system, install a security system, and other purposes. A portion of the lot was used to store vehicles. The adjacent dealerships hired former employs of Automotive, paid the utilities on the property, and cut the grass. Expenses incurred RML WD with respect to the property in 2009 were $26,070. (BPRE exhibit 118.) Wages and commissions RML WD paid to former Automotive employees in 2009 totaled $126,759.30. (BPRE's exhibit 120.)

**Gordon Monroe.** Testimony was offered by Gordon Monroe, who is a Dealer Placement Manager for the pre-bankruptcy Chrysler ("Old Chrysler") and Chrysler Group, LLC (the "New Chrysler") which was formed during the bankruptcy proceedings. From his office in Addison, Texas he gathers the information from prospective franchisees and makes certain investigations of the proposed operations, but that all final decisions on franchises are made in Detroit. His deposition was taken March 16, 2010. (BPRE's exhibit 236.) The New Chrysler was formed June 10, 2001 (Monroe deposition pages 141 and 142). From June 2009 until late August or early September 2009, a Chrysler franchise could not be processed for a license in Texas because the New Chrysler had not qualified to do business in Texas (Monroe deposition page 143). New Chrysler, apparently at the urging of Congress, put a freeze on the issuance of new dealerships from sometime in September through mid-December, 2009 (Monroe deposition pages 160, 163, and 164).

On July 8, 2009, Mr. Monroe issued an Evidence of Franchise to RML WD for a Chrysler, Dodge, and Jeep dealership. (BPRE's exhibit 98.) He sent that evidence of franchise to Mr. Hart by e-mail on July 10, 2010. (BPRE's exhibit 97.) Mr. Monroe testified that: "On July 10, 2009 at 2:30, it was my understanding that, yes, we could move forward, but that changed" because the New Chrysler had not qualified to do business in Texas (Monroe deposition page 63). Franchise agreements issued during that time were useless (Monroe deposition page 61). Mr. Monroe had issued a similar Evidence of Franchise on June 12, 2009. (BPRE's exhibit 17.)

**Paul Hart.** Paul Hart, Chief Financial Officer of the RLJ Group, testified in person and by a deposition taken May 26, 2010. (BPRE's exhibit 238.) He agreed that the initial lease was probably signed about the same time as the APA. (Hart deposition p 87.) The initial lease was

9

to begin when the APA was closed. (Hart deposition p 94.) He was aware that Automotive was having financial difficulties and that time was of the essence in the APA. (Hart deposition p. 97 and 98.) Mr. Hart thought that they would be able to close the APA sometime in April, based on his experience and discussions with Mr. Monroe. (Hart deposition p. 103.) RML WD was trying to push along the closing in April, 2009, but there was a delay in securing floor plan financing. (Hart deposition p. 107.)

With respect to RML WD operating in the property, Mr. Hart stated: "Well, under this asset purchase agreement that was dated in March and the discussions with Mr. Pretzer, he was allowing us to work off his license with the Texas Motor Vehicle Commission. So in this specific case, relating to the March agreement, we were going to use his license for a period of time, we had an agreement for a period of time. And, so, the evidence of franchise is a document that Chrysler gives to you as kind of their letter of intent to go through process with the Motor Vehicle Commission, as we did not need to go through the process since we were trying to push the timetable, as you noted, we did not need it at the time." (Hart deposition p. 117.)

Throughout April, Gordon Monroe of Chrysler told Mr. Hart that approvals from Chrysler were expected at any time, so Mr. Hart was fully expecting to be able to close within a week of April 29. (Hart deposition p 125 – 127.)

Mr. Hart noted that the APA agreement required Automotive to continue operating until the sale/purchase was closed, so that when the operation was closed on May 1, 2009 (the day after Chrysler filed for bankruptcy), Mr. Hart felt that the APA was terminated. Neither party notified the other that the APA was terminated. Mr. Hart felt Mr. Pretzer understood that the APA had been terminated when in May and June, Mr. Pretzer "tried to redo a new agreement and a new lease agreement with us." (Hart deposition p. 135 to 140.)

In mid-July 2009, Gordon Monroe of Chrysler contacted Mr. Hart and told him that the evidences of franchise issued in July were not valid and that RML WD could not use them to move forward with the Texas Motor Vehicle Commission. (Hart deposition p 155 to 160.)

**Steve J. Landers, Jr.** The deposition of Mr. Landers taken April 6, 2010 is BPRE's exhibit 234. Mr. Landers is the President of RML WD and is apparently president of most, if not all, of the auto dealerships in the RLJ Group. He exercises "hands on" management of each of the dealerships (Landers' deposition 13 to 15). Mr. Landers' answers to the other questions in his deposition were so evasive and vague so as to make the balance of his deposition not worthy of consideration. The evidence indicated that Mr. Pretzer verbally negotiated the agreements on behalf of BPRE and Automotive, and Mr. Landers verbally negotiated the agreements on behalf of the RLJ Group. Mr. Landers then handed the drafting off to other personnel, principally Mr. Hart. Mr. Landers signed the final documents on behalf of the RLJ Group and RML WD as was appropriate.

**Robert L. Johnson.** Mr. Johnson's deposition taken April 13, 2010 is BPRE's Exhibit 235. Mr. Johnson is a financier who owns the controlling interest in the RLJ Group and a number of other entities. (Johnson deposition pages 14 and 15.) As Chairman of the Board of the RLJ Group he brings management experience and access to capital to the group, but he exercises very little day-to-day control of the business. (Johnson deposition pages 31 to 33.) His

10

deposition did not reflect any knowledge of the details of the transactions at issue in this case. He did not have any knowledge of the Chrysler bankruptcy until he heard it on the news. (Johnson deposition page 102.)

**BPRE's Bankruptcy.** BPRE filed its Chapter 11 case on November 2, 2009. On February 9, 2010, in BPRE's bankruptcy case, BPRE and RML WD filed a joint motion to assume the July 20, 2009 lease. (Case docket #28.) The motion recited that approximately $25,000 of repairs were needed to the property to bring it into compliance with the Americans with Disabilities Act. The repairs were required by a December 1, 2009 state inspection report, which was attached to the motion. RML WD agreed to make the repairs and to recover $1/12^{th}$ of that cost each month by deducting from the rent until the cost of repairs was paid in full. RLM WD agreed to start paying rent March 1, 2010, even though it had not yet received the necessary approvals to operate a car dealership at that location. The National Bank of Texas, which had a lien on both the Waxahachie and Fairfield properties, had exercised its assignment of rents. The court approved the assumption on February 25, 2010. (Case docket #36.)

By order dated May 11, 2010, the automatic stay was relieved to allow The National Bank of Texas to foreclose on the real estate. (Case docket #54.) The bank foreclosed on both the Waxahachie and Fairfield properties on July 6, 2010.

## DISCUSSION

To say that there was a lack of attention to the wording of the documents involved in these transactions would be an understatement. The verbal and constantly changing positions created many problems in this case. In addition, the expectations of all parties were thrown out of the window by Chrysler's Bankruptcy and subsequent asset sale.

The March 20, 2009 APA called for a closing "on or before April 15, 2009, or as soon thereafter as practical." The evidence showed that it was not realistic to expect to secure the approval of the transaction by Chrysler and then secure a license from the State of Texas in less than a month. Mr. Hart testified that he expected RML WD to initially operate under an agreement to use Automotive's franchise and license until RML WD could secure a franchise from Chrysler and a license from the state. However, there is no mention of such an arrangement in the APA and, although such an agreement was sent to Mr. Pretzer by Mr. Anstice[4], there is no evidence such an agreement was ever signed.

The evidence indicated that Automotive was in a poor financial condition. Although the reason for the closing of Automotive's business on May 1, 2009 was not disclosed in the evidence, it is significant that the closing occurred the day after Chrysler filed for bankruptcy, and that, when Chrysler cancelled Automotive's franchise as part of the bankruptcy process, Automotive made no efforts to keep the franchise.

The March lease was to become effective (in the terms of the APA "enter into a lease") upon the closing of the APA. The closing was not to occur until RML WD secured the necessary permits and licenses. The evidence is that upon the filing of its Bankruptcy, Chrysler stopped issuing franchises. If RML WD could not secure a franchise, the APA could not close.

---

[4] See BPRE's exhibit 71 mentioned above.

11

New Chrysler was formed in June 2009 and the parties expected that New Chrysler would shortly begin issuing franchises. Based on that assumption, BPRE and RML WD entered into the July lease which provided that it would not be effective until RML WD secured a franchise from Chrysler and a license from the State of Texas. RML WD continued its efforts to secure a franchise and a license, and, indeed, thought it had secured a franchise, but as disclosed in the evidence, it was not able to apply for a franchise until December 2009. As shown by the evidence, the July 2009 lease finally became effective on March 1, 2010.

The court finds that RML WD exerted continuous efforts to secure a franchise and a license so that it could operate a Chrysler dealership on BPRE's property, but it was not able to do so until after March 1, 2010. Under the terms of the APA and the leases, RML WD was not obligated for rent until it could use the property for a Chrysler dealership.

The delays were disastrous to BPRE. Without the rent it could not pay the mortgage on the property. That ultimately led to this bankruptcy case and to the foreclosure of the properties. However, these delays were not caused by the Defendants and the Defendants should not be expected to pay a substantial rent on property they could not use.

**Count One: Breach of Contract – Asset Purchase Agreement.**[5] Because of Automotive's dismissal as a plaintiff in this matter, the court must look only to the claims of BPRE, which owned the land and buildings. However, the March lease was an exhibit to the APA and the two transactions were tied together. Mr. Bossier thought that the first lease commenced on March 20, 2009 and that rent should have been paid from that date. However, he did not negotiate the APA and the terms of the APA called for the lease to be entered into at closing. Since the APA was never closed, the March lease never came into effect and BPRE has no claim under Count One.

Since the basis of Count One is a claim by Automotive for breach of contract and Automotive has been dismissed as a plaintiff in this action, the court will not find whether or not the contract was breached. It is worthy of note that in May, June and July, Mr. Pretzer attempted to negotiate another deal for the equipment and did negotiate another lease for BPRE.

**Count Two: Tortious Interference with Franchise Agreements.** This count asserts that the:

> "Defendants actively and intentionally induced Chrysler to reject and breach [Automotive's] valuable franchise agreements. Defendants further induced Chrysler to award the rejected franchises to Defendants. Defendants' intermeddling with [Automotive's] relationship with Chrysler hindered, precluded, or lessened the benefits or increased the burdens to [Automotive] of that relationship, all without legal justification or excuse."

Since this count relates to claims solely held by Automotive (which is no longer a party to this adversary proceeding), the court will not make findings with respect to them.

---

[5] Judge King granted summary judgment in favor of RLJ-McLarty-Landers Automotive Holdings, LLC on count one. (Docket #136.)

12

**Count Three: Tortious Interference with Prospective Business Relations.** This count asserts that:

"There is a reasonable probability that potential customers and other parties would have entered into different, more favorable, or additional contractual relationships with [the plaintiffs; both Automotive and BPRE] but for the Defendants' wrongful conduct.

"Defendants' intermeddling with [the plaintiffs'] relationships with its customers, potential customers, Chrysler, and other parties have precluded [plaintiffs] from entering into other additional valuable business relationships, all without legal justification or excuse. Such relationships were prevented from occurring by independently tortious or unlawful acts by Defendants, including as alleged elsewhere in this Petition.

"Defendants acted with a conscious desire to prevent these relationships or knew that such was certain or substantially certain to occur as a result of their conduct."

With respect to BPRE, there is no evidence to support this count[6]. To the extent this count relates to claims held by Automotive (which is no longer a party to this adversary proceeding), the court will not make findings with respect to them.

**Count Four: Civil Conspiracy.** This count alleges that the "Defendants unlawfully have conspired with each other and with officials of the Federal Government to interfere with [Automotive's] valuable Franchise Agreements, all for their own commercial gain." Since this count relates to a claim solely held by Automotive (which is no longer a party to this adversary proceeding), the court will not make a finding with respect to this count.

**Count Five: Unfair Competition by Misappropriation.[7]** This count asserts that:

"[Automotive's] franchises had substantial commercial value. Over time, they produced many millions of dollars in revenues for [Automotive] and Chrysler. Defendants wrongfully have appropriated for themselves the franchises and the goodwill that [Automotive] developed among the automobile-buying community it served  Defendants have competed directly with [Automotive]. If they accomplish their plan, Defendants will have the benefit of the expense incurred by [Automotive] over the years in developing and maintaining goodwill toward the Chrysler brand among the automobile-buying public in these Texas communities. In essence, by misappropriating the local Chrysler franchises, Defendants will be free-riding on [Automotive's] substantial investments of time, labor, and resources."

---

[6] Even if the court is mistaken and there is some evidence to support this count, BPRE clearly did not meet its burden to establish its claims under this count by a preponderance of the evidence.

[7] Judge King granted summary judgment in favor of RLD-McLarty-Landers Automotive Holdings, LLC on count five. (Docket #136.)

Since this count relates a claim solely held by Automotive (which is no longer a party to this adversary proceeding), the court will not make a finding with respect to this count.

**Count Six: Breach of Contract – Lease.** This count alleges that:

"The Lease is a valid agreement binding on Defendant RML Waxahachie Dodge. All conditions precedent to the inception of the lease term have been performed or were waived by Defendant RML Waxahachie Dodge.

By taking possession of the leased premises but failing to pay rent, Defendant RML Waxahachie Dodge has breached the Lease."

The court did not find the term "Lease" defined in the complaint. If the term relates to the March lease, the conditions had not been fulfilled because in order for the lease to be effective, the purchase contemplated by the APA had to close and the closing did not occur. There is no evidence that RML WD waived the requirement that the sale contemplated by the APA close for the lease to become effective.

If the term relates to the July lease, the conditions had not been fulfilled because in order for the lease to be effective, RML WD had to have received a franchise from Chrysler and a license from the State of Texas. Those conditions were not met or waived until RML WD commenced paying rent on March 1, 2010.

**Count Seven: Quantum Meruit.** This count states:

"[BPRE] had possessory rights to the Waxahachie property

"Landers took possession of the Waxahachie property and changed the locks, effectively ending any ability for [Automotive and BPRE] to access the Waxahachie property. Defendants thereafter began possessory activities including the installation of an ADP dealer management system, mowing and servicing the grounds, and storing items necessary for dealership operations.

"As provided in the Lease Agreement, Landers knew that [BPRE], at all times, expected that Defendants would pay rent on the leased premises after occupation. However, Defendants have failed to pay any rent to [BPRE] after occupying the Waxahachie property."

The court could not find the term "Lease Agreement" defined in the complaint. In an attempt to be cooperative, Mr. Pretzer allowed the Defendants to use a small portion of the property for repairing automobiles for several weeks in July and August, 2009. This allowed a few of Automotive's employees to have employment for a short time after Automotive closed its dealership. For a short time, the Defendants stored a few cars on BPRE's property. In exchange, the Defendants paid the utilities on the property and maintained the property. The Defendants installed a computer system on the property, but the evidence did not show that they changed the locks or in any way excluded either Automotive or BPRE or any of their employees from the property.

The court cannot find that this permitted use was a breach of a lease because no lease was in effect at that time. The payment of utilities and maintenance of the property by the Defendants defeats any claim of quantum meruit.

**Count Eight: Trespass to Real Property.** This count asserts that:

> "[BPRE] had possessory rights to the Waxahachie property.
>
> "On or about May 21, 2009, Landers physically, intentionally, and voluntarily entered the premises and changed the locks, effectively excluding [Automotive and BPRE] from the Waxahachie property. Defendants thereafter began possessory activities.
>
> "Despite [BPRE's] repeated requests to Landers to pay rent for the property it now possessed, Landers has paid [BPRE] nothing."

As noted in the discussion of Count Six, the entry was not a trespass. The remaining claims are not supported by the evidence.

**Count Nine: Unjust Enrichment.** This count asserts that:

"On or about May 21, 2009, Landers took possession of the Waxahachie property. Defendants changed the locks and began using the property.

"Defendants have failed to pay any monies to [BPRE] for the right to access the property and its use. [BPRE] has continued to pay mortgage interest on the property.

"Defendants have been unjustly enriched at [BPRE's] expense based on Defendants' use of the property."

As noted in response to previous counts, the entry was consensual, the locks were not changed and Automotive and BPRE's personnel were not excluded from the property. The evidence did not support the claim that BPRE continued to pay the mortgage interest on the property. In view of the Defendants' payment of expenses in connection with the property, there was no unjust enrichment.

**Attorneys' Fees and Exemplary Damages.** BPRE requests an award of attorney's fees and exemplary damages. In view of the fact that BPRE has not established by a preponderance of the evidence that it is entitled to a recover from any of the Defendants, the request for attorneys' fees and exemplary damages must be denied.

## CONCLUSION

For the reasons stated, BPRE's claims against each and all of the Defendants should be denied.

15

       The court will issue a separate Judgment as required by Fed. Rule Civ. Proc. 54(a) and Rule 58(a) which are made applicable to Adversary Proceedings by Rule 7054(a) and Rule 7058 of the Fed. Rules of Bankruptcy Procedure.

###